FUNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| DATASPAN HOLDINGS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> MARIAN CHOQUER, <br><br> Defendant. | Case No. 2:25-cv-02607 <br><br> DECLARATION OF PAUL ZAIDINS |

I, Paul Zaidins, declare and affirm the truth of the following:

1.      I am an adult of legal age and sound mind. The matters set forth in this Declaration are made upon my own personal knowledge as well as information known and available to me in the ordinary course of business, including through business records and as relayed to me by other employees. I would testify consistent with this Declaration if called to provide live testimony. I make this declaration in support of Plaintiff's Motion for Temporary Restraining Order.

2.      I am employed by, and am 50% co-owner of, Plaintiff DataSpan Holdings, Inc. ("DataSpan"). My current position is Co-Chairman of the Board and Co-Chief Executive Officer.

3.      DataSpan is an industry-leading provider of IT installations, services, and maintenance. DataSpan offers its nationwide clients numerous services for the benefit of their data centers, including data center cleaning, floor replacements and repairs, airflow regulation and maintenance, and power solutions.

4.     To meet its customers' needs, DataSpan employs Account Managers to serve as the company's chief representative in client-facing matters. Our Account Managers work with clients from initial prospecting on potential projects through service delivery.

5.     To serve DataSpan's clients, the company provides our Account Managers with extensive resources and significant access to DataSpan confidential information and trade secrets they can use to quote, develop, service, maintain, and renew customer accounts.

6.     DataSpan's confidential, proprietary, and trade secret information—which includes pricing, proposals, customer needs and specifications, and compilations of internal business information—is closely guarded by DataSpan, is not generally known to the public, and is not readily ascertainable by public sources. It is a valuable business asset, the secrecy of which permits DataSpan to maintain a competitive advantage.

7.     To protect its confidential information and trade secrets from unauthorized use or disclosure, DataSpan requires Account Managers to enter into employee agreements that include confidentiality and "return of property" provisions. In addition, DataSpan implements internal policies and procedures for the secure handling and storage of confidential and proprietary information, limits access to those with a "need to know" such information, and stores such information on password-protected computers and systems.  Because of these protections, DataSpan is able to entrust our Account Managers with our confidential, proprietary, and trade secret information in the performance of their job duties.

8.     In 2022, Marian Choquer ("Ms. Choquer") joined DataSpan as an Account Manager. Ms. Choquer reported to me.

9.     In this role, Ms. Choquer was responsible for prospecting, soliciting, servicing, and managing customer accounts on DataSpan's behalf.

2

10.    In connection with her employment, and in exchange for her access to DataSpan's confidential and proprietary business information, Ms. Choquer executed a written Employee, Confidential Information, Non-Solicitation, and Non-Compete Agreement (the "Agreement"), a copy of which is attached as **Exhibit A**.

11.    During the first half of 2025, DataSpan was retained by a longstanding and key client ("MS") to perform a significant floor replacement project at a data center (the "Floor Replacement Project").

12.    MS was a longstanding and key customer DataSpan introduced to Ms. Choquer to manage on its behalf. Another DataSpan Account Manager developed the relationship with MS, which Choquer became introduced to and acquainted with by virtue of her employment. MS is one of the largest buyers in the world for the kinds of products and services offered by DataSpan.

13.    The Floor Replacement Project was split into two "phases": Phase I and Phase II. DataSpan and its third-party business partners completed Phase I in the summer of 2025, with Choquer acting as the Account Manager (*i.e.*, the sales representative and primary point of contact) for DataSpan. Third-party Canadian importer and supplier, Modular Interiors by Cook's ("Cook's"), provided the tiles for Phase I of the Floor Replacement Project.

14.    Despite DataSpan's successful completion of Phase I, MS opted to purchase the tile and installation services directly from Cook's for Phase II, effectively cutting DataSpan and its third-party partners out of the project.

15.    Ms. Choquer never indicated to DataSpan that it was at risk of not receiving the work for the Phase II project. DataSpan's loss of this project created concern that Ms. Choquer may have been aware of (and perhaps even participated in) the diversion of this opportunity away from DataSpan.

3

16. Accordingly, DataSpan reviewed Ms. Choquer's email activities surrounding the Floor Replacement Project, which validated and heightened DataSpan's suspicions.

17. Despite Ms. Choquer having exchanged many dozens of emails with MS and Cook's in the first half of 2025 related to Phase I, her DataSpan email account was virtually devoid of any email traffic related to Phase II after the first few months of 2025.

18. DataSpan found no evidence Ms. Choquer had made any effort in the summer of 2025 to restart communications with MS about securing Phase II of the Floor Replacement Project for DataSpan. Nor did she tell anyone that MS was considering not using DataSpan on Phase II.

19. The few emails Ms. Choquer did exchange in July and August 2025 that related to Phase II were highly suspicious.

20. For example, in late July 2025, Ms. Choquer emailed the client contact at MS that he would receive a proposal with pricing from Cook's. This approach would make no sense had Ms. Choquer been working diligently to secure Phase II on DataSpan's behalf.

21. Equally concerning, DataSpan discovered evidence in Ms. Choquer's DataSpan email account that, during the summer of 2025, Ms. Choquer had used her personal Gmail email account to exchange emails with Cook's owner, Russell Cook.

22. Ms. Choquer would have had no legitimate business reason to use her personal email account to communicate with Mr. Cook about Phase II of the Floor Replacement Project had she been working to secure Phase II for DataSpan.

23. DataSpan also found evidence of meetings between Ms. Choquer and Mr. Cook during the very time period when Cook's pursued and won the Phase II project from MS.

24. On November 13, 2025, DataSpan suspended Ms. Choquer pending its investigation into her activities.

Decl. of Zaidins - Page 4

25.     After retrieving Ms. Choquer's work-issued laptop from her on November 13, DataSpan sent the laptop to a third-party computer forensic consultant for analysis.

26.     The forensic analysis revealed that on November 13, 2025, shortly before meeting with DataSpan personnel, Ms. Choquer copied DataSpan's confidential and proprietary information and had deleted thousands of documents from her work-issued laptop. Based on the folder and file names related to the copying and deletions, I recognize many of them to be related to DataSpan customers and other company-related information.

27.     DataSpan's forensic consultant recovered two proposals from Cook's to MS that had been deleted from Choquer's work-issued laptop—one dated July 1, 2025 (an apparent draft), and another version dated October 1, 2025 (an updated version of the proposal).

28.     Although these proposals were recovered from Choquer's work-issued laptop, they were not found in her DataSpan email account, suggesting Choquer received them via a personal account, saved them to her work-issued laptop, and then deleted them to cover her tracks.

29.     There is no legitimate DataSpan-related business reason why Choquer would have these proposals on her computer.

30.     On December 5, 2025, Co-CEO Sharon Zaidins, Vice President of Operations John Bates, and I called Ms. Choquer to discuss DataSpan's investigation of Phase II of the Floor Replacement Project and how Cook's was able to win the project.

31.     Ms. Choquer said Kevin Beck (who was not a DataSpan employee) had introduced Cook's owner Russell Cook to MS and that she and Mr. Beck had toured MS with Mr. Cook to introduce Cook's ASP tiles to MS.

5

Decl. of Zaidins - Page 5

32. Ms. Choquer then claimed no vendor within the United States could provide the ASP tiles. She later claimed that only Mr. Beck could supply ASP tiles in the United States. I have since learned that both of these statements were false.

33. Ms. Choquer admitted to working with Cook's on the Phase II project. She claimed she had no other recourse and had to "take care of her customer."

34. When asked why, if she had had difficulty sourcing the tiles, she had not reached out to DataSpan's management for help, Ms. Choquer responded that we "didn't understand."

35. Ms. Choquer said she had used her personal Gmail email account to communicate with Cook's because she had had "too much to do." Based on the fact that Ms. Choquer was issued a DataSpan email account and could (and in fact, did) communicate with Mr. Cook using that account, her explanation does not make sense to me. I can think of no legitimate business reason why Ms. Choquer would need to communicate with Mr. Cook via a personal email address.

36. When asked whether she had been paid in connection with Cook's winning and performing the Phase II project, Ms. Choquer refused to answer.

37. Ms. Choquer also said she was working on several things "outside of DataSpan."

38. Co-CEO Sharon Zaidins reminded Ms. Choquer she had a duty to DataSpan because she was DataSpan's employee.

39. Ms. Choquer became angry during the call and denied she had done anything wrong. Ms. Choquer abruptly ended the phone call.

40. On December 5, 2025, following this phone conversation, DataSpan terminated Ms. Choquer's employment, effective immediately. This termination occurred via email, since Ms. Choquer ended the phone call.

6

41.     Also on December 5, 2025, DataSpan authorized its outside legal counsel to send a letter to Ms. Choquer demanding she immediately provide all necessary cooperation to comply with her legal obligation under the Agreement to return all DataSpan property and to prevent the unauthorized use or disclosure of DataSpan's confidential and proprietary information. A copy of this letter is attached as **Exhibit B**.

42.     Having received no response from Ms. Choquer, DataSpan proceeded to initiate this litigation.

43.     Based on the foregoing facts, DataSpan reasonably believes Ms. Choquer remains in possession of DataSpan's confidential and proprietary information and trade secrets related to DataSpan's business and clients.

44.     DataSpan undertakes efforts to protect the secrecy of its confidential and proprietary business information. DataSpan trains and advises its employees regarding the protection of its confidential information and trade secrets, limits the disclosure and use of such information to those with a need to know and to use such information, limits access to its trade secrets and confidential information by restricting access to its computer networks and devices, and requires employees to sign agreements containing confidentiality obligations.

45.     The disclosure of the information contained in the documents Ms. Choquer appears to have taken from DataSpan would have potential to cause serious competitive harm to DataSpan. These documents include valuable business information about DataSpan's clients and client accounts products, including pricing and client specifications and needs, which DataSpan endeavors to safeguard against unauthorized disclosure.

Decl. of Zaidins - Page 7

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated December 19, 2025.

Paul Zaidins
Co-Chief Executive Officer
DataSpan Holdings, Inc.

8

# EXHIBIT A



**EMPLOYEE, CONFIDENTIAL INFORMATION,
NON-SOLICITATION, AND NON-COMPETE AGREEMENT**

As a condition of my employment with DataSpan Holdings, Inc. (the "***Company***") and in consideration of the Company's agreement to disclose certain Confidential Information (as defined below in Section 10) to me, any compensation now and/or hereafter paid to me, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, I hereby agree to all of the terms and conditions of this Employee, Confidential Information, Non-Solicitation, and Non-Compete Agreement (this "***Agreement***") as follows:

1.    ***Employee Agreement***.

1.1    ***Company Business Activities***.    During my employment with the Company, I will devote my entire business time and attention to developing and improving the business and best interests of the Company and will carry out, to the best of my ability, such duties, tasks and responsibilities as the Company may request of or assign to me from time to time.  I will not promote the business, products or services of any other person or entity or engage in any outside business activity during the term of my employment with the Company without prior express written permission of the Company.

1.2    ***Policies and Procedures.***    I will comply with all rules, policies, procedures and regulations made or issued from time to time by the Company.

1.3    ***Prospect and Customer Information***.    I will communicate to the Company on an ongoing basis complete information about prospects and customers of the Company's products and services that I obtain during the course of my employment.

2.    ***Nondisclosure***.

2.1    ***Company's Agreement to Disclose Confidential Information***. Upon execution of this Agreement, and to enable me to provide services on behalf of the Company, the Company hereby agrees to provide me with access to Confidential Information, which may include initial specialized and other training, all at the Company's cost.  I understand that not all transmittals of Confidential Information will be made to me in writing, but rather, Confidential Information can be disclosed to me in a variety of different methods, including through formal and informal counseling, coaching, training, and informational meetings.  I further acknowledge and agree that the Company's conduct in agreeing to and providing me with Confidential Information in exchange for my Nondisclosure Agreement (as defined below) gives rise to the Company's interest in restraining me from competing, directly or indirectly, against the Company as set forth in Section 3 (the "***Non-Compete and Non-Solicitation***

*Agreement*”), and that my agreement to this Non-Compete and Non-Solicitation Agreement is designed to enforce my Nondisclosure Agreement (as defined below).

2.2    ***Nondisclosure Agreement****.*  I agree that during my Service and thereafter, pursuant to this Section 2.2 (the "***Nondisclosure Agreement***"), I will hold in strictest confidence and not use, except in connection with the good faith performance of my duties for the benefit of the Company, any of the Confidential Information, and after my Service concludes, will not disclose, make available, discuss, transmit, use, lecture upon, or publish any Confidential Information, except as such disclosure, availability, discussion, transmission, use, lecture or publication may be expressly authorized in writing by the Company's Board of Directors or Chief Executive Officer, in any such case pursuant to a written non-disclosure agreement that sufficiently protects the Confidential Information.  I further acknowledge and agree that all rights, title, and interest in any Confidential Information will remain the exclusive property of the Company.  I also acknowledge and agree that in connection with this Nondisclosure Agreement, I will also be bound by the provisions of Section 3, that my obligations under this Agreement are in addition to, and not in limitation of, all other obligations of confidentiality that I may have to the Company, including those under general legal or equitable principles (for example, the Texas Uniform Trade Secrets Act).  The obligations provided for in this Section 2.2 shall survive the termination of my employment in perpetuity.

2.3    ***Third Party Information***.  At all times during my Service and thereafter, I will hold Third Party Information in the strictest confidence and not use it except as necessary in carrying out my work for the Company consistent with the Company's agreement with such third party, and I will not disclose, make available, discuss, transmit, use, lecture upon, or publish any Third Party Information, except as such disclosure, availability, discussion, transmission, use, lecture or publication may be required in connection with my Service, or unless the Chief Executive Officer or the Board of Directors of the Company expressly authorizes such in writing.

2.4    ***Former Employer Information***.  I agree that during my Service I shall not use or incorporate into any Company information any proprietary or confidential information or trade secrets of any former employer, any person or entity for whom I provided services, or any other person or entity, unless I have obtained all consents, licenses and/or other rights necessary to allow me to provide the Company with the assignments and licenses set forth herein, and the Company has expressly consented thereto in writing.  I represent and warrant that during my Service I shall not improperly use or disclose any proprietary or confidential information or trade secret, if any, of any former employer or any other person or entity to whom I have an obligation of confidentiality, and I will not bring onto the premises of the Company any unpublished documents or any property belonging to any former employer or any other person or entity unless expressly consented to in writing by that former employer, person or entity. I further represent that I am not a party to any currently effective employment contract, covenant not to compete, non-solicitation agreement or other agreement that could potentially have any bearing on my ability to accept employment with the Company, and that the Company has instructed me that I am not to perform any action, directly or

-2-

Decl. of Zaidins - Page 11

indirectly, in the course of any duties or responsibilities that I may have at any time for the Company, that would violate the terms of any currently effective contract to which I am a party.

2.5    ***Notice of Unauthorized Disclosure***.    If I lose or make unauthorized disclosure of any Confidential Information, I will immediately notify the Company in writing and take all reasonable steps necessary to retrieve the lost or improperly disclosed Confidential Information.

2.6    ***Notice of Immunity under the Economic Espionage Act of 1996, as amended by the Defend Trade Secrets Act of 2016 ("DTSA")***.    I understand and acknowledge that I will not be held criminally or civilly liable under any federal or state law for any disclosure of a trade secret that:  (i) is made in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney and solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding.  (If I file a lawsuit for retaliation by the Company for reporting a suspected violation of law, I may disclose the Company's trade secrets to my attorney and use the trade secret information in the court proceeding if I file any document containing the trade secret under seal and do not disclose the trade secret, except pursuant to court order.

2.7    ***Acceptable Disclosures***.    I understand and acknowledge that notwithstanding Section 2.2 and Section 2.3, nothing in this Agreement prohibits me from (i) reporting possible violations of law or regulation to any appropriate government agency, entity or official, (ii) making other disclosures that are protected under whistleblower provisions of law, including in accordance with the provisions of and rules promulgated under Section 21F of the Securities Exchange Act of 1934, as amended, or Section 806 of the Sarbanes-Oxley Act of 2002, or any other whistleblower protection provisions of federal, state or local law or regulation, (iii) receiving an award or monetary recovery pursuant to the Securities and Exchange Commission's or other governmental authority's whistleblower program, (iv) participating in a proceeding with any appropriate federal, state or local government agency, (v) making any truthful statements or disclosures required by law, regulation or legal process, or (vi) requesting or receiving confidential legal advice.  I understand that I do not need prior authorization to make such reports or disclosures, and I am not required to notify the Company that I have made any such report or disclosure.  I further acknowledge that the Company encourages all employees (if they are comfortable doing so) to make an internal report to any management-level employee, if he/she has concerns that federal, state or local laws or regulations have been violated.

3.    ***Non-Competition; Non-Solicitation***.

3.1    ***Provision of Confidential Information***.    I understand and acknowledge that the Company's agreement in Section 2.1 to provide me with access to Confidential Information, and the Company's further provision of Third Party Information, customer goodwill and initial specialized and other training, to which I have not previously had access, is based in material part on my agreement to the provisions

-3-

Decl. of Zaidins - Page 12

of this <u>Section 3</u>, and that any breach by me of the provisions of this <u>Section 3</u> will materially damage the Company.  I also acknowledge that work and experience with the Company will enhance my value to competitive firms, and that the nature of the Confidential Information and Third Party Information to which I will be given access would make it difficult, if not impossible, for me to work for a competing company in a position where my duties are similar to those I perform for the Company without disclosing or utilizing the Confidential Information and/or Third Party Information.  I hereby waive and release any claim that I should be able to use, for the benefit of any competing person or entity, Confidential Information, Third Party Information, customer goodwill, or initial specialized and other training that was received or developed by me while working for the Company.

3.2     ***Interference with Customer Relationships***.  I acknowledge and agree that information about the Company's customers and the Company's marketing strategy with respect to those customers constitutes Confidential Information and may be a trade secret of the Company.  I agree that during the course of my Service, and for a period of twelve (12) months immediately following the termination of my Service for any reason, whether with or without cause, at the option either of the Company or myself, with or without notice, or twelve (12) months from the date of any court order enforcing all or part of this Agreement, whichever is later, I will not, directly or indirectly, individually or on behalf of any other person, firm, partnership, corporation or business entity of any type, solicit to the detriment of the Company and/or for the benefit of any competitor of the Company, take away or attempt to take away, in whole or in part, any Customer of the Company or otherwise interfere with the Company's relationship with any such Customer; and I will not use Confidential Information (which may include trade secrets) or other unfair business practices to divert or attempt to divert from the Company any Customer of the Company.  For purposes of this <u>Section 3.2</u>, "***Customer***" shall mean any person, company or business entity (i) to which the Company sells or licenses goods or services and (ii) that I had contact with or performed services for during my Service with the Company or about whom I had access to Confidential Information by virtue of my employment with the Company. This Section is geographically limited to wherever any Customer can be found or is available for solicitation, and I agree that I may not avoid the purpose and intent of this paragraph by engaging in conduct within the geographically limited area from a remote location through means such as telecommunications, written correspondence, computer generated or assisted communications, or other similar methods.

3.3     ***Non-Solicitation***.  I acknowledge that the Company's employees are a valuable resource of the Company.  I agree that during the course of my Service, and for a period of twelve (12) months immediately following the termination of my Service for any reason, whether with or without cause, at the option either of the Company or myself, with or without notice, or twelve (12) months from the date of any court order enforcing all or part of this Agreement, whichever is later, I will not, directly or indirectly, individually or on behalf of any other person, firm, partnership, corporation or business entity of any type, (i) solicit, assist, recruit, induce, or in any way encourage any employee or consultant of the Company to terminate his or her employment relationship or consulting relationship with or for the Company or (ii) hire any person

-4-

who was an employee of the Company or any of its subsidiaries or affiliates at any time during the twelve (12) month period immediately prior to the date on which such hiring would take place.

      3.4    ***Covenant Not to Compete***.  I agree that during the course of my Service, and for a period of twelve (12) months immediately following the termination of my Service for any reason, whether with or without cause, at the option either of the Company or myself, with or without notice, or twelve (12) months from the date of any court order enforcing all or part of this Agreement, whichever is later, I will not, directly or indirectly, do any of the following in the Territory:  (i) act or agree to act as an advisor, agent, consultant, director, employee, officer, partner, proprietor, or other similar title or role; (ii) own or acquire any ownership interest in (except for passive ownership of two percent (2%) or less of any entity whose securities have been registered under the Securities Act of 1933, as amended, or Section 12 of the Securities Exchange Act of 1934, as amended); or (iii) participate in the organization, financing, operation, management, and/or control of any person, corporation, firm, or other entity, for any person or entity that competes with, or that is planning to compete with, the Company's business (A) as conducted by the Company at the conclusion of my Service or in the preceding six (6) month period or (B) planned to be conducted by the Company pursuant to a product or business plan developed during my Service with the Company and about which I had knowledge; provided, however, I may work or consult for a business that markets, sells, designs, develops or manufactures products or provides services in competition with the Company so long as I do not work or consult for a division, group, subsidiary or affiliate of such business that sells, designs, develops or manufactures such products or provides services in competition with the Company, or assist such division, group, subsidiary, or affiliate in any way to compete with the Company.  "***Territory***" shall have no geographic restriction during my Service and after the conclusion of my Service and thereafter "***Territory***" shall mean such geographic areas in which on the date of such Service termination (i) the Company's products and services were deployed, (ii) the Company had a customer, or (iii) the Company had operations or otherwise targeted sales and marketing activities or conducted or had plans to conduct business.  I agree that I may not avoid the purpose and intent of this paragraph by engaging in conduct within the geographically limited area from a remote location through means such as telecommunications, written correspondence, computer generated or assisted communications, or other similar methods.

      3.5    ***Non-disparagement***.  I agree that I will not at any time make any statement or otherwise take any action that would be or might reasonably be interpreted as harmful or disparaging to the Company, or its subsidiaries, affiliates, equity holders, directors, managers, partners, officers, employees, agents or representatives, as applicable.  Notwithstanding anything in this Section 3.5 to the contrary, I shall not be restricted from making statements or taking actions in good faith as part of any legal proceeding between me, on the one hand, and the Company, or its subsidiaries, affiliates, equity holders, directors, managers, partners, officers, employees, agents or representatives, on the other hand.

3.6   ***Reasonableness; Enforcement.***

(a)   I acknowledge that my fulfillment of the obligations contained in this Agreement, including, but not limited to, my obligation neither to use, except for the benefit of the Company, nor to disclose the Company's Confidential Information and my obligations not to compete contained in this Section 3 are necessary to protect the Company's Confidential Information and to preserve the Company's value and goodwill and that the Confidential Information has been developed by the Company through substantial expenditures of time, effort and money and constitutes valuable and unique property of the Company.   I further acknowledge the time, geographic, and scope limitations of my obligations under this Section 3 are reasonable, especially in light of the Company's desire to protect its Confidential Information, and that I will not be precluded from gainful employment if I am obligated not to compete with the Company as described above.

(b)   This Agreement is understood to be clear and enforceable as written and is executed by both parties on that basis.   However, should I later challenge any provision as unclear, unenforceable or inapplicable to any competitive activity that I intend to engage in, I will first notify the Company in writing and meet with a Company representative and a neutral mediator (if the Company elects to retain one at its expense) to discuss resolution of any disputes between the parties.   I will provide this notification at least fourteen (14) days before I engage in any activity on behalf of a competitor of the Company or engage in other activity that could foreseeably fall within a questioned restriction.   The failure to comply with this requirement shall waive my right to challenge the reasonable scope, clarity, applicability and/or enforceability of the Agreement and its restrictions at a later time.   All rights of both parties will be preserved if this requirement is complied with even if no agreement is reached in the conference.   I further agree that during the term of the restrictions in this Section 3, I shall promptly inform the Company in writing of the identity of any new employer, the job title of my new position, and a description of any services to be rendered to that employer.

4.   ***Company Technology Systems***.   I understand and acknowledge that I have no reasonable expectation of privacy in any computer, technology system, email, handheld device, telephone or documents that are used to conduct the business of the Company.   As such, the Company has the right to audit and search all such items and systems, without further notice to me, to ensure that the Company is licensed to use the software, to ensure compliance with the Company's policies and this Agreement, and for any other business-related purposes in the Company's sole discretion.   I understand and acknowledge that I am not permitted to add any unlicensed, unauthorized or non-compliant applications to the Company's technology systems and that I shall refrain from copying unlicensed software onto the Company's technology systems or using non-licensed software or websites.   I understand and acknowledge that it is my responsibility to comply with the Company's policies governing the use of the Company's documents and the internet, email, telephone and technology systems to which I will have access in connection with my employment.

-6-

Decl. of Zaidins - Page 15

5.      ***Return of Company Property***.  When my Service is completed or at the Company's request at any time, I will immediately deliver to the Company (and will not keep in my possession, recreate, or deliver to anyone else) all drawings, notes, records, data, files, notes, reports, proposals, lists, correspondence, blueprints, sketches, materials, equipment, memoranda, specifications, devices, formulas, and other documents (whether written, printed, or otherwise reproduced or recorded), together with all copies thereof, including copies stored in any electronic or other medium, and any other material containing, constituting or disclosing any Third Party Information, or Confidential Information.  I will also immediately deliver all Company property, including, but not limited to, laptops, pagers, cell phones, corporate credit cards, keys, passwords and pass codes, and/or access cards, in each case without deletion, erasure, destruction or alteration of any kind whatsoever.  I further agree that all property situated on the Company's premises and owned, leased or licensed by the Company, including disks and other storage media, filing cabinets, or other work areas, is subject to inspection by personnel of the Company at any time with or without notice.

6.      ***Legal and Equitable Remedies***.

6.1      ***Generally***.  I acknowledge and agree that any breach or threatened breach by me of any term of this Agreement shall not be subject to the arbitration provision set forth in Section 9.2.  Accordingly, I agree that the Company shall be entitled to the following relief, each of which shall be independent of the other and severally enforceable, and each of which is in addition to, and not in lieu of, any other relief available to the Company and its subsidiaries and affiliates at law or in equity: (i) specific enforcement of the restrictive covenants in Section 3, or obtaining a temporary restraining order and/or a preliminary and/or permanent injunction, in each case (without posting a bond or, if a bond is required to make such order effective,  a bond in the amount of $100 shall be sufficient), it being agreed that any breach or threatened breach of such restrictive covenants would cause immediate and irreparable injury to the Company, and its subsidiaries and affiliates and that money damages would not provide an adequate remedy; and (ii) an order requiring you and others in concert with you to account for and pay over to the Company and its subsidiaries and affiliates any profits, monies, accruals, increments and/or other benefits derived as the result of any transactions constituting a breach of such restrictive covenants.  Without limiting the generality of the foregoing, the Company may pursue any remedy available to it, without limitation, including declaratory relief, concurrently or consecutively in any order as to any breach, violation, or threatened breach or violation, and the pursuit of one such remedy at any time will not be deemed an election of remedies or waiver of the right to pursue any other remedy at that time or at any other time.  I acknowledge that the remedies contained in this Section 6.1 are reasonably related to the injuries the Company may sustain as a result of my breach or threatened breach of my obligations under Section 3 and are not a penalty.

6.2      ***Recovery of Attorneys' Fees***.  If any action in arbitration or at law or in equity is brought to enforce or interpret the provisions of this Agreement, the party prevailing in any such litigation shall recover from the adverse party its actual damages, as well as its reasonable costs and expenses, including, without limitation, and whether

-7-

Decl. of Zaidins - Page 16

actual damages are awarded or not, reasonable attorneys' fees incurred in connection with such dispute and litigation.

6.3     ***Extension of Tolling Period***.   If it is judicially determined that I have violated any of my obligations under <u>Section 3</u> of this Agreement, then the period applicable to each obligation that I am determined to have violated will automatically be extended by a period of time equal in length to the period during which such violation(s) occurred.

7.     ***Authorization to Notify New Employer***.   In the event that my employment with the Company terminates for any reason, I will provide a copy of this Agreement to any subsequent employer, and I hereby authorize the Company to notify and provide a copy of this Agreement to any new employer or entity for whom I provide services about my rights and obligations under this Agreement following the termination of my Service.

8.     ***Notices***.   Any notices required or permitted hereunder shall be given to the appropriate party at the party's last known address.   Such notice shall be deemed given upon personal delivery to the last known address or if sent by certified or registered mail, three (3) days after the date of mailing.

9.     ***General Provisions***.

9.1     ***Governing Law***.   THIS AGREEMENT WILL BE GOVERNED BY THE LAWS OF THE STATE OF TEXAS WITHOUT REGARD FOR CONFLICTS OF LAWS PRINCIPLES.

9.2     ***Alternative Dispute Resolution; Arbitration; Class Action Waiver***.   By signing this Agreement, I agree that any controversy, claim or dispute arising out of this Agreement or my employment with the Company, its subsidiaries or affiliates must be settled through good faith negotiation.   If the controversy, claim or dispute cannot be settled through such negotiation, the parties agree to attempt in good faith to settle the matter by mediation in Dallas, Texas administered by JAMS.   If the parties cannot agree on a mediator within twenty (20) days of a written request to mediate, the mediator, who shall have relevant employment law experience, shall be selected by JAMS pursuant to the JAMS Rules and in its sole judgment.   The mediator shall provide the rules and procedures for the mediation if the parties cannot agree on such rules and procedures.   The costs of the mediator shall be shared equally by the parties, and each party shall bear their own expenses.   If the parties are unsuccessful at resolving the controversy, claim or dispute through mediation, the parties agree to submit the matter to binding arbitration in Dallas, Texas administered by JAMS, and, subject to <u>Section 6.1</u>, the parties agree that this arbitration will be the only remedy for resolution of any such controversy, claim or dispute.   This promise to resolve matters by arbitration is equally binding upon both me and the Company and its affiliates, except to the extent provided in <u>Section 6.1</u>.   Any arbitration will be administered by JAMS under its Employment Arbitration Rules and Procedures ("JAMS Rules") and subject to JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness, as each may be amended from time to time.   If the parties cannot agree on an arbitrator within

-8-

twenty (20) days of a written request to arbitrate, one (1) arbitrator shall be selected by JAMS pursuant to the JAMS Rules, which arbitrator shall have, in the sole judgment of JAMS, relevant employment law experience.  The arbitrator shall have the power to award all relief afforded by applicable law.  Judgment on the arbitration award may be entered in any court having jurisdiction.  The costs of the arbitrator shall be shared equally by the parties, and each party shall bear its own expenses, subject in each case to allocation by the arbitrator pursuant to applicable law or JAMS Rules.  The Company and I agree that arbitration shall be on an individual basis only, and I expressly waive my right to participate in any class action or collective action proceedings in any court or arbitration with respect to any controversy, claim or dispute with the Company, its subsidiaries or affiliates.  All disputes between me and the Company, its subsidiaries or affiliates must be resolved on an individual basis; provided, however, that nothing in this Agreement limits my right to file a charge with any governmental agency.  All alternative dispute resolution matters shall be confidential, except to the extent provided by law or to the extent such matters must be disclosed in a legal proceeding.

9.3   ***Entire Agreement***.   This Agreement, and any offer letter or employment agreement, sets forth the entire agreement and understanding between the Company and me relating to the subject matter hereof and supersedes and merges all prior discussions or representations between us, including, but not limited to, any representations made during my interview(s) or relocation negotiations, whether written or oral, and any previously executed proprietary information agreements.   No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by me and the Chief Executive Officer of the Company.  Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

9.4   ***Severability***.

(a)   I acknowledge and agree that each agreement and covenant set forth herein constitutes a separate agreement independently supported by good and adequate consideration and that each such agreement shall be severable from the other provisions of this Agreement and shall survive this Agreement.

(b)   I understand and agree that this Agreement is to be enforced to the fullest extent permitted by law.  Accordingly, if an arbitrator or court of competent jurisdiction determines that the scope and/or operation of any section of this Agreement, including, but not limited to, Section 3.2, Section 3.3, Section 3.4, other parts of Section 3 and/or Section 9.2, is too broad to be enforced as written, the Company and I intend that such provision should be reformed to such narrower scope and/or operation as such arbitrator or court determines to be enforceable; provided, however, that such reformation applies only with respect to the operation of such provision in the particular jurisdiction with respect to which such determination was made. It is the parties' intent that any provision so reformed shall provide the Company the maximum protection permitted by law.   If, however, any section of this Agreement, including, but not limited to, Section 3.2, Section 3.3, Section 3.4, other parts of Section 3 and/or Section 9.2, is held to be illegal, invalid or unenforceable under present or future law, and not subject

-9-

Decl. of Zaidins - Page 18

to reformation, then (i) such provision shall be fully severable, (ii) this Agreement shall be construed and enforced as if such provision was never a part of this Agreement, and (iii) the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance.

9.5    ***Successors and Assigns***.  This Agreement will be binding upon my heirs, executors, administrators, and other legal representatives and will be for the benefit of the Company, its successors and assigns.  I expressly agree that the Company has the right to assign this Agreement.

9.6    ***Survival***.  The provisions of this Agreement shall survive the termination of my Service for any reason and the assignment of this Agreement by the Company to any successor in interest or other assignee.

9.7    ***At-Will Relationship***.  I acknowledge and agree that my employment with the Company is for an unspecified duration and constitutes "at-will" employment.  The Company has and will continue to have the absolute and unconditional right to terminate me for any reason or no reason, with or without cause or prior notice.  Nothing in this Agreement shall obligate the Company to continue to retain my employment.  I further agree that nothing in this Agreement shall limit, in any way, the fiduciary duties that I owe to the Company under any applicable law.

9.8    ***Waiver***.  No waiver by the Company of any breach of this Agreement shall be a waiver of any preceding or succeeding breach.  No waiver by the Company of any right under this Agreement shall be construed as a waiver of any other right.  The Company shall not be required to give notice to enforce strict adherence to all terms of this Agreement.

9.9    ***Construction***.  The headings to each section or paragraph of this Agreement are provided for convenience of reference only and shall have no legal effect in the interpretation of the terms hereof.  The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against either party.

9.10   ***Counterparts***.  This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same agreement.

9.11   ***Execution and Delivery***.  A facsimile, electronic transmission or other reproduction of this Agreement may be executed by one or more parties to this Agreement, and an executed copy of this Agreement may be delivered by one or more parties to this Agreement by facsimile or similar electronic transmission device pursuant to which the signature of or on behalf of such party can be seen, and such execution and delivery shall be considered valid, binding and effective for all purposes.  At the request of any party to this Agreement, all parties to this Agreement agree to execute an original of this Agreement as well as any facsimile or other reproduction of this Agreement.

-10-

10.    *Definitions*.

10.1  "*Confidential Information*" means all information of any kind (tangible and intangible, written and oral, and including information contained or transmitted through any electronic medium) owned by the Company or licensed from third parties or that otherwise relates to the Company's actual or proposed business, which is not publicly available, including, without limitation, (i) research, development, technical data, trade secrets, know-how, negative know-how, drawings, engineering plans, hardware configuration information, products and product plans, marketing, sales, and business plans, budgets, unpublished financial statements, licenses, prices, business costs, contracts and other agreements, the identities of and information about suppliers and customers (including, but not limited to, the Company's customers on whom I called or with whom I became acquainted during the term of my employment), customer and potential customer lists, and other business information; (ii) the identity, personal data, personnel information, and skills of employees, contractors, and consultants (excluding my own information); (iii) specialized training; and (iv) other non-public information relating to the Company that is not readily ascertainable. Confidential information does not include any information that I can establish through tangible evidence:  (i) was publicly known prior to the time of disclosure by Company to me or (ii) became publicly known after disclosure by Company to me, but through no wrongful action or omission by me or others known to be under an obligation of confidentiality to the Company.

10.2  "*Service*" means the period during which I am engaged as an employee of the Company.

10.3  "*Third Party Information*" means confidential or trade secret information that the Company may from time to time receive from third parties or information related to inventions of third parties, which is subject to a duty on the Company's part to maintain the confidentiality of such Third Party Information and to use it only for certain limited purposes.

(Signature page follows)

-11-

I UNDERSTAND THAT THIS AGREEMENT, AMONG OTHER THINGS, RESTRICTS MY RIGHT TO DISCLOSE OR USE CONFIDENTIAL INFORMATION AND THIRD-PARTY INFORMATION (AS THOSE TERMS ARE HEREIN DEFINED) DURING OR SUBSEQUENT TO MY PERIOD OF SERVICE, PROHIBITS ME FROM COMPETING WITH THE COMPANY DURING AND FOR TWELVE (12) MONTHS AFTER MY SERVICE IS TERMINATED FOR ANY REASON, AND FROM SOLICITING EMPLOYEES AND CUSTOMERS OF THE COMPANY DURING AND FOR TWELVE (12) MONTHS AFTER MY SERVICE IS TERMINATED FOR ANY REASON.

I ACKNOWLEDGE AND AGREE TO EACH OF THE FOLLOWING ITEMS: (I) I AM EXECUTING THIS AGREEMENT VOLUNTARILY AND WITHOUT ANY DURESS OR UNDUE INFLUENCE BY THE COMPANY OR ANYONE ELSE; (II) I HAVE CAREFULLY READ THIS AGREEMENT; (III) I HAVE ASKED ANY QUESTIONS NEEDED FOR ME TO UNDERSTAND THE TERMS, CONSEQUENCES, AND BINDING EFFECT OF THIS AGREEMENT AND FULLY UNDERSTAND THEM; AND (IV) I SOUGHT THE ADVICE OF AN ATTORNEY OF MY CHOICE AND HAD THE OPPORTUNITY TO PROVIDE COMMENTS HERETO IF I WANTED TO BEFORE SIGNING THIS AGREEMENT.

This Agreement shall be effective as of the first day of my Service.

Dated: ___8/25/22___.

___Marian Choquer___
Signature of Employee

___Marian Choquer___
Print Employee Name

ACCEPTED AND AGREED TO:
DataSpan Holdings, Inc.

By: _____

Name: ___Paul Zaidins___

Title: ___Chairman & CEO___

Address:

2814 SE 78th Ave.
Portland, OR 97206

# EXHIBIT B

# Ogletree Deakins

**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**

*Attorneys at Law*

300 N Meridian Street, Suite 2700
Indianapolis, IN 46204
Telephone:  317-916-1300
Facsimile:   317-916-9076
www.ogletree.com

Justin A. Allen
(317) 916-2533
justin.allen@ogletree.com

December 5, 2025

**_Via Electronic Mail and Certified Mail_**
**_Return Receipt Requested – 9314 7699 0430 0143 2307 43_**
Marian Choquer
10500 221st Ln. NE #201
Redmond, WA 98053
marian.choquer@gmail.com

> RE:    **Your Unauthorized Possession of DataSpan Confidential Information**
> **IMMEDIATE ATTENTION REQUIRED**

Ms. Choquer:

Our law firm represents your former employer, DataSpan Holdings, Inc. ("DataSpan" or the "Company").  If you are represented by counsel, please forward a copy of this letter to your attorney.  Please give this letter your immediate attention.

As you are aware, your employment with the Company ended on December 5, 2025, following your suspension on November 13, 2025.  During its investigation into your activities related to the apparent diversion of the Microsoft Phase II project, the Company discovered (through a third-party forensic analysis) that on November 13, shortly prior to your meeting with John Bates, you copied massive amounts of DataSpan confidential information and trade secrets from your work-issued laptop to a set of external storage devices (the "USB Devices").  After the exfiltration of these documents, you then deleted a large volume of data from your work-issued laptop.  In addition, forensic analysis reveals your use of a personal Box cloud storage account on your work-issued laptop, to which you saved DataSpan confidential information and trade secrets.

Your unauthorized exfiltration and deletion of DataSpan documents is a serious violation of Company policy and constitutes misappropriation of trade secrets under state and federal law, as well as a violation of your Employee Confidential Information, Non-Solicitation, and Non-Compete Agreement (the "Agreement").  A copy of your Agreement is enclosed for your convenience.

Under Paragraph 5 of the Agreement, you are obligated to "immediately deliver to the Company" all property and documents, including confidential information, retaining no copies.  **The Company hereby demands that you immediately provide all necessary cooperation to comply with this legal obligation to return all Company property and to prevent the unauthorized use or disclosure of the Company's confidential information.**

Atlanta ▪ Austin ▪ Berlin (Germany) ▪ Birmingham ▪ Boston ▪ Charleston ▪ Charlotte ▪ Chicago ▪ Cleveland ▪ Columbia ▪ Columbus ▪ Dallas ▪ Denver ▪ Detroit Metro ▪ Fresno ▪ Greenville
Houston ▪ Indianapolis ▪ Kansas City ▪ Las Vegas ▪ London (England) ▪ Los Angeles ▪ Memphis ▪ Mexico City (Mexico) ▪ Miami ▪ Milwaukee ▪ Minneapolis ▪ Montréal (Canada) Morristown
Nashville ▪ New Orleans ▪ New York City ▪ Oklahoma City ▪ Orange County ▪ Paris (France) ▪ Philadelphia ▪ Phoenix ▪ Pittsburgh ▪ Portland, ME ▪ Portland, OR ▪ Raleigh ▪ Richmond
St. Louis ▪ St. Thomas ▪ Sacramento ▪ Salt Lake City ▪ San Antonio ▪ San Diego ▪ San Francisco ▪ Seattle ▪ Stamford ▪ Tampa ▪ Toronto (Canada) ▪ Torrance ▪ Washington

re: DataSpan's Confidential Information
December 5, 2025
Page 2

To that end, by **close of business on Monday, December 8**, please contact me (or have your counsel contact me) at the email address listed above to provide the following information and unequivocal assurances:

1.   You will agree to immediately turn over the four USB Devices you plugged into your work-issued laptop computer on November 13:

     • Memorex USB Flash Drive USB Device (SN:071C48A5C3B0CC82)
     • ST912082 3AS USB Device (SN:ST9120823A5NJ0JQ76)
     • SABRENT SCSI Disk Device (SN:6&212d0eed&0&000000)
     • PNY USB 2.0 FD USB Device (SN:AAC30F3100000562)

2.   You will identify every device: (i) to which you have connected any of the USB Devices since November 13, 2025; (ii) from which you have accessed the Box account; and/or (iii) to which you have copied, saved, or otherwise stored any DataSpan Confidential Information.  You will agree to turn over any responsive devices to the Company's third-party forensic vendor for investigation and remediation.

3.   You will identify and agree to return all DataSpan "Confidential Information" (as defined in your Agreement) in your possession, custody, or control, whether in electronic or hard-copy format.

4.   You will identify every use or disclosure of DataSpan's Confidential Information by you, except any use or disclosure made in the course and furtherance of your employment at DataSpan.  This includes the identification of any disclosure, copying, or forwarding of any of the documents saved to the USB Devices on November 13.

5.   You will provide all reasonable and necessary cooperation to us with respect to the investigation, return, and remediation of your misappropriation, including but not limited to a declaration under oath and cooperation with our forensic consultant.

**Until further instruction, you should not alter, delete, forward, copy, or otherwise access or modify any documents, devices, or electronically stored information responsive to this letter.**

DataSpan reserves all rights and is actively exploring its legal rights and remedies.  The Company is prepared to pursue injunctive relief if we do not receive your full cooperation as requested herein.  The Company believes litigation may ultimately be necessary to secure the return of its Confidential Information and trade secrets and/or to recover damages for the improper diversion of the Microsoft Phase II project.  As such, you remain under an ongoing obligation to preserve all relevant evidence, as more fully set forth in my November 13 correspondence.

We look forward to hearing from you no later than Monday.

Sincerely,

*/s/ Justin A. Allen*